UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

PATTIE L. CATRON,                    )
                                     )
            Plaintiff,               )
                                     )
v.                                   )        No. 2:15-CV-169
                                     )        Judge Phillips
EASTMAN CHEMICAL COMPANY,            )
                                     )
            Defendant.               )

## <u>MEMORANDUM OPINION</u>

Plaintiff Pattie L. Catron has sued her former employer, defendant Eastman Chemical Company ("Eastman"), for various employment discrimination claims arising from her termination in September 2013. Specifically, she claims that she was terminated due to her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, her gender in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, in retaliation for her complaints of age and gender discrimination in violation of the ADEA and Title VII, and that she was subject to a hostile work environment. Eastman has now moved for summary judgment [Doc. 13] on all of plaintiff's claims. The parties have filed thorough briefs in support of and in opposition to the pending motion, along with supporting affidavits and exhibits [Docs. 14, 15, 16, 21, 22, 23, 29].

After careful consideration of all the relevant pleadings, the defendant's motion for summary judgment [Doc. 13] will be **GRANTED**.

## I. Plaintiff's Affidavit

Before addressing the merits of the pending motion, the Court will first address the concerns raised by Eastman regarding plaintiff's affidavit. In response to Eastman's motion for summary judgment, plaintiff filed a responsive brief [Doc. 21] in compliance with this Court's 25-page limit, E.D. Tenn. L.R. 7.1(b), and a 40-page affidavit [Doc. 22]. Eastman's reply brief [Doc. 23] urges the Court to completely disregard this affidavit as full of inadmissible hearsay, contradictory to plaintiff's deposition testimony, argumentative, and an attempt to evade the page limits of the local rules. Plaintiff's supplemental response [Doc. 29] argues that the purported hearsay statements are within the exception of Fed. R. Evid. 801(d)(2)(D) as statements by employees regarding work-related matters within the scope of their employment, that some of the statements provide non-hearsay notice to the plaintiff, and that the alleged testimonial inconsistencies are not in fact inconsistent with or embellishments of plaintiff's deposition testimony.

Eastman is correct that the Court must consider only admissible evidence presented in conjunction with a motion for summary judgment. Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible evidence."); *see Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) ("Hearsay evidence may not be considered on summary judgment"). Eastman is also correct that a party may not create a question of fact by filing an affidavit in direct contradiction to the party's earlier sworn testimony. *Aerel v. S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 907—08 (6th Cir. 2006); *Reid v. Sears,*

*Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). If, however, the affidavit is not directly contradictory, the Court should not strike or disregard the affidavit unless it is "an attempt to create a sham fact issue." *Aerel*, 448 F.3d at 908. Thus, to the extent plaintiff's affidavit is directly contradictory to her deposition testimony, the Court will not consider the affidavit.

Plaintiff is correct that a statement is not hearsay under Rule 801(d)(2)(D) when it concerns a matter within the scope of the declarant's employment.[1] *Back v. Nestle USA, Inc.*, 694 F.3d 571, 577 (6th Cir. 2012) (citing *Carter v. Univ. of Toledo*, 349 F.3d 269, 275—76 (6th Cir. 2003)). However, when statements concern decisions to which the employee was not a party, they are outside the scope of the employee's employment and are therefore not subject to the party-admission rule. *Liadis v. Sears, Roebuck & Co.*, 47 F. App'x 295, 303 (6th Cir. 2002). Further, "Rule 801(d)(2)(D) is designed to bind the employer where one of its managerial employees makes a statement within the scope of the employee's duties as a manager." *Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 750 (6th Cir. 2005). Many of the statements of which Eastman complains were made by non-managerial employees and the statements are not binding on the employer. *See Jacklyn*, 176 F.3d at 928 ("There is a critical difference between making a statement while one is an employee and having the actual or implied authority to make such a statement on behalf

---

[1]Fed. R. Evid. 801(d)(2)(D) provides an exception to the hearsay rule for statements offered against a party-opponent and "made by the party's agent or employee on a matter within the scope of that relationship and while it existed."

3

of your employer"). Most importantly, many of the statements of which Eastman complains are simply not material to the issues to be determined by Eastman's motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a genuine issue of material fact must involve facts that might affect the outcome of the suit under the governing law). To the extent that plaintiff's affidavit contains material, non-hearsay statements, or facts which are not directly contradictory of plaintiff's deposition testimony, the Court will consider it.

Finally, while plaintiff's 40-page affidavit may indeed be an effort to circumvent the page limitation in E.D. Tenn. L.R. 7.1(b), the Court observes that the explicit language of Rule 7.1(b) applies the page limit to "briefs" and does not include affidavits or other supporting materials. Eastman has not cited any authority, nor is the Court aware of any authority, to support the argument that the plaintiff's affidavit may be completely disregarded because of its length.

## II.     Relevant Facts

Plaintiff Pattie L. Catron was hired in August 2012 as an Administrative Assistant to Dr. Brendan Boyd, a Director in Eastman's Additive and Functional Products Technology Division at Eastman's facility in Kingsport, Tennessee [Doc. 14-1 at pp. 4—5; Doc. 15 at ¶¶ 2—3]. At the time she was hired, plaintiff was 57 years old [Doc. 14-1 at p. 44].

As an Administrative Assistant, plaintiff reported directly to Dr. Boyd and she occasionally provided assistance to other Group Leaders in the department [Doc. 15 at ¶

4

4]. Her duties involved handling administrative tasks for Dr. Boyd, including managing his Outlook schedule; scheduling and planning meetings and events; submitting travel and other business expenses for reimbursement; managing and updating budgeting and expense spreadsheets and reports; timekeeping for employees in the department; creating and formatting documents; and performing other administrative tasks related to Dr. Boyd and his team's work product [*Id.*]. These duties required attention to detail, problem solving skills, and proficiency with a number of computer programs utilized on a daily basis [*Id.*].

As a new employee, plaintiff had several months of orientation, Eastman training, and on-the-job training with assistance from other Administrative Assistants in her division [Doc. 14-1 at pp. 11—12]. During this time, Dr. Boyd was out of the office travelling quite a bit and for medical treatment [Doc. 15 at ¶ 5]. He concluded that her work performance was satisfactory during this period [*Id.*]. Plaintiff describes him as very busy and "kind" to her during this time [Doc. 14-1 at p. 14].

All new Eastman employees participate in quarterly development and evaluation reviews ("D&ER") during the first year of their employment. These reviews generally are to be conducted at the 13-week, 26-week, 39-week, and 52-week marks [Doc. 15 at ¶ 6]. The reviews are to provide feedback and coaching on employee performance, strengths, and opportunities for development [Doc. 14-1 at p. 62]. The expectation is that if, despite the opportunities provided through this process, an employee fails to meet performance expectations, the employee will be terminated [Doc. 15 at ¶ 6].

In her 13-week and 26-week D&ERs, Dr. Boyd rated plaintiff as "fully meeting company's requirements for regular employment and has shown the capability for continued career growth" [Doc. 14-1 at pp. 75—77, 79—81].[2] Plaintiff agrees that she was treated fairly in these performance reviews [Doc. 14-1 at pp. 18, 20].

As plaintiff's employment with Eastman continued, however, the parties agree that her relationship with Dr. Boyd deteriorated.[3] Dr. Boyd states that plaintiff's performance declined as she "became fully engaged" in the responsibilities of her position with less support from her peers [Doc. 15 at ¶ 8]. Specifically, he states that she was having difficulty with attention to detail, accuracy, thoroughness, problem solving, and decision-making [*Id.*]. Dr. Boyd perceived that plaintiff lacked proficiency in using Outlook, Excel, PowerPoint and SAP [*Id.* at ¶ 9]. As an example, Dr. Boyd states that she made errors when organizing his meetings on Outlook; incorrectly submitted his expense reports; and provided incorrect information on spreadsheets used for monthly leadership team meetings [*Id.*]. Plaintiff claims that Dr. Boyd "started being pretty hostile" and saying "belittling" things to her [Doc. 14-1 at p. 15].

On June 17, 2013, Dr. Boyd sent an email to certain other Group Leaders who worked with Ms. Catron soliciting feedback on her job performance [Doc. 15 at ¶ 10].

---

[2]Plaintiff's 13-week D&ER was conducted on January 3, 2013, and her 26-week D&ER was conducted on January 11, 2013 [Doc. 14-1 at pp. 17, 19]. Plaintiff states that these reviews were conducted so close together because Dr. Boyd was late getting his D&ERs completed [Doc. 14-1 at p. 19].

[3]Plaintiff estimates that her relationship with Dr. Boyd began to "sour" in April 2013 [Doc. 14-1 at p. 15].

6

Jeremy Lizotte responded that he had experienced difficulty with plaintiff "in scheduling things and her not considering where I already have conflicting meetings on my calendar. …[S]he has called with scheduling conflicts two times recently rather than simply scheduling over something I already have on my calendar. The big issue is having to provide so much input into getting something done that it is often easier to do it myself. I have tried to let her know she has the power to decide food or other fairly benign details but she still requires a final decision from someone else" [Doc. 15-1 at p. 2].[4] Jake Goodrich responded that he was reluctant to rely on her for scheduling meetings, interviews, or ordering lunches for meetings based on the negative experiences he had heard from others. He specifically observed that she had difficulty using Outlook effectively. "I have seen her send out multiple notices for the same meeting, schedule meetings in the wrong meeting location, not know how to view meeting confirmations, etc. I think the underlying issue here might be poor adaptability or ability to learn new tasks" [Doc. 15-1 at p. 3].[5] Scott Armentrout responded that he did not "trust her to assemble the puzzle of fitting interviews into a wide array of calendars." He also mentioned a recent

---

[4]Plaintiff disputes that she ever scheduled meetings for Mr. Lizotte and that, when planning lunch meetings, she requested input in an attempt to be sensitive to the attendees' food preferences [Doc. 22 at ¶¶ 72—73].
[5]Plaintiff responds that she is unaware of any "negative experiences" to which Mr. Goodrich is referring and that she only sent out multiple meeting notices when Dr. Boyd changed the time, date, attendees, or location of a meeting, rather than based on any mistakes she made [Doc. 22 at ¶¶ 76—77].

experience in which she did not follow instructions in printing out certain PowerPoint slides [Doc. 15-1 at p. 4].[6]

As a result of this feedback and his own observations, Dr. Boyd rated Ms. Catron as not meeting expectations in her 39-week D&ER on June 24, 2013 [Doc. 15 at ¶ 11; Doc. 15-2]. In discussing this review with her, Dr. Boyd advised plaintiff that if her performance did not improve, her employment could be terminated [Doc. 15 at ¶ 12].

Plaintiff describes the June 24, 2013 meeting differently. She states that Dr. Boyd was "slamming his fist on the desk," saying she "wasn't as good as a younger assistant, April White,"[7] that dealing with her "just made it crawl up his spine,"[8] and that plaintiff wasn't as good as he thought when he hired her [Doc. 14-1 at p. 21]. She states that "he was raging, waving his arms around, and telling me that I just didn't do anything right" [Id.]. Plaintiff claims she did not get to read the 39-week review, because Dr. Boyd "slung it around" for her to sign without reading it and she was scared not to sign it [Id.]. Plaintiff also states that Dr. Boyd "was beating his fist at me, just telling me how much I was not like the younger assistant, April White; that she was much better than me, that she did

---

[6]Plaintiff responds that she did not do any travel planning for Group Leaders, she did not manage their calendars, and she did not schedule hiring interviews for any Group Leaders [Doc. 22 at ¶¶ 78—79]. She further does not recall either Mr. Armentrout nor Dr. Boyd discussing their dissatisfaction with her printing out slides for Mr. Armentrout and she does not remember doing so [Id. at ¶ 79].

[7]Plaintiff describes April White as in "in her mid-30's" and the executive assistant to Vice President Steve Crawford, who was Dr. Boyd's supervisor [Doc. 22 at ¶ 10].

[8]She later described this comment as "[h]e said it crawled up his spine when I started crying and was upset in front of him" [Doc. 14-2 at p. 24].

8

everything for her boss, Steve Crawford, and he couldn't trust me to do anything" [*Id.* at p. 22].[9]  Plaintiff testified that she told him he was creating a hostile environment and asked if she could look for other positions in Eastman and he said "No" [Doc. 14-1 at p. 24].[10] Later that day, plaintiff states that she asked Dr. Boyd if she could move to another position within the company and he stated that they would "work through it" [Doc. 14-1 at p. 27].[11]

Following the June 24, 2013 meeting, Dr. Boyd approved and Eastman paid for plaintiff to attend 21 additional hours of off-site training on Microsoft Office, including PowerPoint [Doc. 14-1 at p. 28; Doc. 15 at ¶ 13].  However, Dr. Boyd observed that plaintiff continued to exhibit many of the same performance deficiencies as noted in her 39-week review, including attention to detail, Outlook calendaring and scheduling errors, mistakes with travel arrangements, and difficulties with spreadsheets [Doc. 15 at ¶ 14].  For example, plaintiff scheduled Dr. Boyd on a flight that departed from the Knoxville airport

---

[9]Plaintiff also claims that during this meeting, which took place on Monday morning, Dr. Boyd complained that she had a meeting scheduled incorrectly on his calendar for Wednesday.  She claims that she explained to him that she knew the meeting would have to be rescheduled and that she updated the calendar on Monday afternoons [Doc. 14-1 at p. 25].

[10]In her affidavit, plaintiff claims she told him on June 26 that he was creating a hostile work environment and he told her she could not look for other positions at Eastman "at this time" [Doc. 22 at ¶ 33].

[11]Dr. Boyd acknowledges that plaintiff inquired about transferring to another position with Eastman "at some point."  However, he opines that "it is inappropriate and unfair to approve [an employee who is not meeting expectations in their current position] to transfer elsewhere as that just results in placing the burden of a poorly performing employee on another supervisor" [Doc. 15 at ¶ 14].

but returned to the Tri-Cities airport; this would have been a problem for Dr. Boyd upon his return to the Tri-Cities when his car was in Knoxville [Doc. 15 at ¶ 15].[12]

The record reflects other instances of Dr. Boyd's criticism of plaintiff's performance following the June 24, 2013 meeting [Doc. 15-3 at pp. 10—15]. In the emails, Dr. Boyd and others note problems with scheduling meetings, calendaring on Outlook, and running reports. In a telling email exchange, Dr. Boyd relayed some of these concerns to Ashley Angles, Human Resources ("HR") Manager for Eastman's Technology Division, and asked "[d]o we really need to wait 6 weeks?" [Id. at p. 10].

Around August 16, 2013, plaintiff and Dr. Boyd completed a six-month performance review which contained both her self-evaluation and his evaluation of her performance [Doc. 14-1 at pp. 29—31].[13] In her deposition, plaintiff claims she received Dr. Boyd's feedback via email and they discussed it [Id. at pp. 30—31]. She admits that Dr. Boyd rated her as "behind" and "at risk" in certain categories [Id. at p. 31]. In her affidavit, plaintiff claims she met with Dr. Boyd for the six-month review and he told her she was "doing better but still wasn't doing my work as well as 'April White, the young assistant for Steve'" [Doc. 22 at ¶ 38].

On September 9, 2013, plaintiff met with Dr. Boyd regarding her request to take vacation toward the latter part of the month. She claims that he told her that she could not

_____

[12]Plaintiff admits that she made these arrangements, but claims that the flights were booked this way because of repairs being made to the tarmac at the Tri-Cities airport such that Dr. Boyd could not fly out of Tri-Cities but that he could return to Tri-Cities [Doc. 14-1 at pp. 35—36].
[13]This review is not contained in the record.

10

take vacation during the requested week and that she used "bad judgment" [Doc. 14-1 at p. 41]. She stated that he got angry and "started slamming his fists" [*Id*.]. Then, she states that he told her she "didn't do anything right … [and she] wasn't as good as a younger assistant, April White" [*Id*.].[14] Plaintiff claims he then told her he didn't trust her to do anything and that she "made a very bad decision" [*Id*.]. Plaintiff states that Dr. Boyd told her to go on her vacation and he would do her evaluation when she returned [*Id*. at pp. 41—42].

Dr. Boyd describes the September 9 meeting differently. He advised plaintiff that her vacation request was poorly timed given that Eastman was conducting its World Wide Technical Conference in Kingsport, Tennessee in September 2013 [Doc. 15 at ¶ 17]. During the time plaintiff wanted to be on vacation, Eastman employees who worked with and/or reported to Dr. Boyd would be coming to town from other U.S. and international sites for the conference and plaintiff was needed to assist these individuals with respect to planning, scheduling, conference rooms, etc. [*Id*.]. Because he had received substantial assistance from other Administrative Assistants when traveling to Eastman's Asia sites for business, Dr. Boyd wanted to make sure that his employees and colleagues were afforded the same courtesy and assistance [*Id*.]. Nevertheless, Dr. Boyd approved plaintiff's

---

[14]Although her deposition testimony is somewhat scattered on this point, plaintiff testified that Dr. Boyd made the "younger assistant" remark four times between June and September 2013 [Doc. 14-1 at p. 45]. In her affidavit, plaintiff states that Dr. Boyd told her in the September 9 meeting that April White was "younger and better at her job" [Doc. 22 at ¶ 42].

vacation request [*Id*.]. He agrees that he told her he would conduct her 52-week D&ER when she returned from vacation [*Id*. at ¶ 18].

Following the September 9, 2013 meeting, two things happened. First, Dr. Boyd began working on plaintiff's 52-week performance review, including identifying the ongoing performance issues that he had experienced, and he concluded that her employment with Eastman should be terminated [Doc. 15 at ¶ 19]. Second, plaintiff met with Ms. Angles and reported several concerns about Dr. Boyd [Doc. 14-1 at p. 42]. According to Ms. Angles, plaintiff reported that Dr. Boyd told her he thought she was smarter when he hired her; that he did not trust her to do his work and he talked down to her; that he was assertively animated with his hands and said "I could fire you at any time"; that he told her that she was not as good as other assistants he had worked with; that she did not need to go to HR regarding looking for another position within Eastman because he would ask HR about that; that he failed to respond to her request for vacation; and that he said it was bad judgment to take vacation at the time in question [Doc. 14-1 at pp. 48—53; Doc. 16 at ¶ 3].

Although not reflected in Ms. Angles' notes, plaintiff testified that she told Ms. Angles that Dr. Boyd said she was not "as good as the younger assistant, April White" and that Ms. Angles responded, "[h]e has crossed the line" [Doc. 14-1 at p. 53]. Plaintiff claims she asked Ms. Angles to investigate and talk to her peers [*Id*.]. Plaintiff's affidavit states that Ms. Angles telephoned her at home later that day and told plaintiff she had relayed her complaints to Dr. Boyd, but that plaintiff could return to work the next morning without

12

fear of retaliation [Doc. 22 at ¶ 93]. Plaintiff admits that she had no issues with Dr. Boyd between September 9 and the time she went on vacation, beginning September 16, nor from the time she returned from vacation, September 23, until her termination [Doc. 14-1 at pp. 54—55].

The next day, September 10, 2013, Ms. Angles met with plaintiff to go over the concerns she had raised [Doc. 16 at ¶ 4]. In addition to the concerns mentioned in their first meeting, plaintiff reported that Dr. Boyd was creating a "hostile environment" on the day he was slinging his hands and said he could fire her at any time [Doc. 16 at ¶ 4]. She also reported that a few days after their June D&ER meeting, Dr. Boyd said he would hate to be under that pressure, i.e., not knowing if he was going to fire her [*Id.*]. Ms. Angles does not recall plaintiff making allegations of gender or age discrimination, nor do her notes reflect Dr. Boyd's alleged statement regarding a "younger" assistant [*Id.* at ¶ 5]. Nevertheless, Ms. Angles advised plaintiff that she would investigate her concerns [Doc. 14-1 at pp. 55—56].[15] Ms. Angles interviewed Dr. Boyd and several other employees that had direct interaction with them [Doc. 16 at ¶ 6]. Barbara Rasnick, also an Administrative Assistant, advised Ms. Angles that she had heard Dr. Boyd's tone of voice be elevated, that she had seen plaintiff leave his office upset on occasion, that Dr. Boyd could ask questions in a pessimistic way, and that others sometimes feel his requests are unreasonable [*Id.* at ¶

---

[15]Dr. Boyd acknowledges that Ms. Angles contacted him in September 2013 regarding concerns plaintiff had reported about their working relationship. He claims that Ms. Angles did not relay any complaints that he made a comment about plaintiff's age or saying she was not as good as a younger assistant [Doc. 15 at ¶ 26].

13

7].  The other individuals generally corroborated Dr. Boyd's views that plaintiff's job performance was deficient and that she struggled with attention to detail, organization, and with scheduling meetings on Outlook [*Id.*].

On the day after plaintiff returned from her vacation, Ms. Angles met with plaintiff and informed her that she had concluded her investigation and that Dr. Boyd had not committed any violations of company policy [Doc. 14-1 at pp. 56—57].  Ms. Angles states that she did not reach any conclusion regarding concerns about age discrimination since plaintiff did not report such concerns to her [Doc. 16 at ¶ 8].  Ms. Angles also states that she did not advise Dr. Boyd of any allegations of age discrimination or his alleged comments about "younger assistants" [*Id.* at ¶ 9].

On September 25, 2013, plaintiff met with Tyra Copas, Human Resources Manager, Steve Crawford, Vice President of Functional Products and Technology, and Dr. Boyd [Doc. 15 at ¶ 21].  They reviewed plaintiff's 52-week D&ER, which outlined specific examples of deficiencies in her work [*Id.*].  Mr. Crawford reviewed the standard expectations for all Administrative Assistants and then he communicated that due to her continued performance deficiencies, her employment was terminated [*Id.*].[16]  At the time of her termination, plaintiff was 58 years old [Doc. 22 at ¶ 2].

---

[16]In her affidavit, plaintiff claims Dr. Boyd told her she was being discharged because she had booked a taxi ride to the airport for him at the wrong time when he was on vacation the year before [Doc. 22 at ¶ 56].  She also claims that Dr. Boyd criticized her for leaving a meeting scheduled on his agenda for September 11, 2013, with a vacationing group leader, but that she had deleted the meeting from his agenda on Monday afternoon [*Id.* at ¶ 57].  Finally, she claims that Dr. Boyd

14

After plaintiff's termination, she was replaced by Kathy Chapman, who was age 55 at the time [Doc. 16 at ¶ 10]. Ms. Chapman voluntarily retired in 2016 and she was replaced by Barbara Rasnick, who was age 62 at the time [*Id.* at ¶ 11].

## III.    Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477

---

announced that "a couple of group leaders" had told him she "asked too many questions" and that she was not allowed to respond to the criticisms in her evaluation [*Id.* at ¶¶ 58—59].

15

U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Anderson*, 477 U.S. at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## IV. Analysis

### A. Age Discrimination Claim

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge ... or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on a claim under the ADEA, the ADEA's "because of" language requires that a plaintiff "prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 177–78

16

(2009) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 141–43 (2000)). For an employer to take an adverse action "because of age" means "'that age was the "reason" that the employer decided to act.'" *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2527 (2013) (quoting *Gross,* 557 U.S. at 176). The question then is whether the evidence, if believed, requires the conclusion that age was the "but for" cause of plaintiff's termination.

A plaintiff may establish a claim of age discrimination by either direct or circumstantial evidence. *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009). "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Scheick v. Tecumseh Pub. Sch.*, 766 F.3d 523, 530 (6th Cir. 2014) (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.,* 360 F.3d 544, 548 (6th Cir. 2004)). Statements not made by decisionmakers, or statements made by decisionmakers "unrelated to the decisional process itself cannot suffice to satisfy the plaintiff's burden" under the direct evidence approach. *Geiger,* 579 F.3d at 621 (quoting *Bush v. Dictaphone Corp.,* 161 F.3d 363, 369 (6th Cir. 1998)) (internal alterations omitted). In addition, the statement must clearly evince the decisionmaker's intent to discriminate on the basis of age. *Scott v. Potter,* 182 F. App'x. 521, 526 (6th Cir. 2006) ("'Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age,' satisfy this criteria.") (quoting *Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir. 1989)).

Eastman argues that plaintiff's evidence, even if believed, that Dr. Boyd stated plaintiff was "not as good as the younger assistant, April White" is not direct evidence of

17

discrimination [Doc. 14 at pp. 18—19].  Instead, Eastman argues that the comment is only a factual assessment of plaintiff's performance in comparison to Ms. White, rather than an assessment that plaintiff was not as good as Ms. White *because of* her age.  Plaintiff does not directly respond to this argument, but merely notes that her evidence of age discrimination consists of Dr. Boyd's "younger assistant" comments whether they are considered to be direct or circumstantial evidence [Doc. 21 at p. 4].

The Court agrees with Eastman that these comments, even if true, do not qualify as direct evidence.  While it is undisputed that Dr. Boyd was the decisionmaker as to plaintiff's termination, the comments were not about the decision to terminate her.  Instead, they represent Dr. Boyd's assessment that plaintiff's job performance was "not as good as" a younger person's.  He did not say that plaintiff's performance was not as good *because* she was older, or that Ms. White's job performance was better *because* she was younger.  Nor, more to the point, did Dr. Boyd state that he was terminating plaintiff *because* of her age.  The statements do not "clearly evince [his] intent to discriminate on the basis of age" and do not require the conclusion that plaintiff's termination was based on age-related animus.

"Circumstantial evidence … is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred."  *Richardson v. Wal–Mart Stores, Inc.*, 836 F.3d 698, 703 (6th Cir. 2016) (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011)).  To establish a *prima facie* case of age discrimination with circumstantial evidence, the

plaintiff must demonstrate that: (1) that she was a member of a protected class; (2) that she was discharged; (3) that she was qualified for the position held; and (4) that she was replaced by someone "substantially younger." *Williams v. Union Underwear Co.*, 614 F. App'x 249, 255 (6th Cir. 2015); *Hale v. ABF Freight Sys., Inc.*, 503 F. App'x 323, 333—34 (6th Cir. 2012) (while some of the Circuit's cases state that an ADEA plaintiff must show that she was replaced by someone outside of the protected class … "it is sufficient to show that a replacement is substantially younger"); s*ee Johnson v. Lockheed Martin Corp.,* 598 F. App'x 364, 368 (6th Cir. 2015) ("A 'substantially younger' person is someone more than six years younger than the plaintiff"); *Grosjean v. First Energy Corp.,* 349 F.3d 332, 340 (6th Cir. 2003) (analyzing authority and concluding that "in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant").

Eastman argues that plaintiff cannot establish the fourth prong of the prima facie case because she was not replaced by someone significantly younger [Doc. 14 at pp. 11—12]. At the time of her termination in 2013, plaintiff was 58 years old. She was replaced by Kathy Chapman, age 55. After Ms. Chapman voluntarily retired approximately two and a half years later, she was replaced by Barbara Rasnick, age 62. Plaintiff does not dispute these facts, but contends that these moves were done simply to defend against her discrimination claims [Doc. 21 at pp. 10—11]. This is pure speculation and does not alter the undisputed facts that she was not replaced by someone substantially younger.

Plaintiff also argues that her "unique" claims do not fit within the traditional *McDonnell Douglas* paradigm requiring her to present evidence regarding a "comparator" or a "replacement" [*Id*. at pp. 11—12]. In fact, as Eastman points out, plaintiff's case is a "garden variety" employment discrimination case: she claims she was terminated for discriminatory reasons and the employer claims she was terminated for poor performance. Plaintiff cites no authority for the suggestion that she is excused from proving a prima facie case. Indeed, it is well settled that the plaintiff's inability to satisfy a prima facie case is sufficient in itself to dismiss her ADEA claim. *See Green v. Fidelity Investments*, 374 F. App'x 573, 577 (6th Cir. 2010); *Scola v. Publix Super Markets, Inc.*, 902 F. Supp. 2d 1083, 1094 (E.D. Tenn. 2012) (Collier, J.).

Finally, plaintiff relies on the hearsay information from Eastman employees Barbara Rasnick and Barbara Carrico that Kathy Chapman, her replacement, did not take on all of plaintiff's duties so that she "would not be overwhelmed" [Doc. 22 at ¶ 65]. As Eastman notes [Doc. 23 at p. 4], this information is hearsay and may not be relied upon when deciding a summary judgment motion because neither Ms. Rasnick nor Ms. Carrico were managerial employees speaking about matters within the scope of their duties. *Barner*, 399 F.3d at 750; *Jacklyn*, 176 F.3d at 927.

Alternatively, the fourth prong of the prima facie case can also be established by a showing that plaintiff was treated less favorably than a similarly situated employee from outside the protected class. *Diebel v. L&H Resources, LLC*, 492 F. App'x 523, 529 (6th

20

Cir. 2012). Plaintiff has presented no such evidence and therefore cannot establish a prima facie case of age discrimination.

Assuming plaintiff could establish a prima facie case, the burden of production then shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment decision. *Provenzano*, 663 F.3d at 812. Here, Eastman says that it terminated plaintiff because of her poor work performance [Doc. 14 at p. 15]. If the employer meets this burden, "the employee then bears the burden of rebutting this proffered reason by proving that it was pretext designed to mask discrimination." *Id.* At all times, the plaintiff retains the burden of persuasion to demonstrate that the adverse employment decision was made because of her age. *See Richardson v. Wal–Mart Stores, Inc.*, 836 F.3d 698, 704 (6th Cir. 2016); *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010).

To establish pretext, the plaintiff must show that: (1) the defendant's reasons for terminating the plaintiff "had no basis in fact"; (2) the stated reasons "did not actually motivate [the plaintiff]'s discharge"; or (3) the defendant's proffered reasons "were insufficient to motivate [the plaintiff's] discharge." *Segel v. Kimberly–Clark Corp.,* 473 F. App'x. 416, 420 (6th Cir. 2012) (citing *Manzer v. Diamond Shamrock,* 29 F.3d 1078, 1084 (6th Cir. 1994)). "A reason cannot be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012); *see St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 519 (1993) ("it is not enough ... to disbelieve the employer; the fact finder must

21

believe the plaintiff's explanation of intentional discrimination."); *Blizzard v. Marion Tech. College,* 698 F.3d 275, 283 (6th Cir. 2012) ("The burden of persuasion is on the plaintiff to show that "age was the 'but-for' cause of the employer's adverse action.'"). "A plaintiff's *prima facie* case, together with evidence showing the employer's proffered reason is false, permits the jury to infer the ultimate fact of intentional discrimination." *Moffat v. Wal–Mart Stores, Inc.,* 624 F. App'x. 341, 349 (6th Cir. 2015).

Plaintiff contends that the two unfavorable performance reviews were contrived and never presented to her for a meaningful response, thus defeating Eastman's legitimate reason for her termination [Doc. 21 at p. 14]. However, plaintiff's evidence that the performance reviews were contrived is simply based on her disagreement with Dr. Boyd's assessment of her performance. Plaintiff's affidavit largely consists of her attempts to disagree with or explain away Dr. Boyd's complaints about her performance. For example, her inability to balance a budget sheet was due to a "hidden tab" Dr. Boyd had inserted [Doc. 22 at ¶ 16]; she could not complete Dr. Boyd's expense reports because he failed to give her all of his invoices [*Id.* at ¶ 17]; and Eastman's computer system would not allow her to customize organizational charts [*Id.* at ¶ 26]. It is well settled that a plaintiff's subjective evaluation of her performance does not establish pretext or that age was the "but-for" cause of her termination. *See Green,* 374 F. App'x at 577; *Mynatt v. Lockheed Martin Energy Sys., Inc.,* 271 F. App'x 470, 477 (6th Cir. 2008) ("an employee's evaluation of his own performance or qualifications is irrelevant as a matter of law") (citing *Wrenn v. Gould,* 808 F.2d 493, 502 (6th Cir. 1987)); *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 585

(6th Cir. 1992) ("conclusory allegations and subjective beliefs … are wholly insufficient to establish a claim of discrimination as a matter of law").

Finally, the Court agrees that Eastman is entitled to the benefit of the "same actor inference" in light of the fact Dr. Boyd both hired and then terminated plaintiff approximately one year later [Doc. 14 at pp. 16—17]. *See Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 801 (6th Cir. 2007). It is unlikely Dr. Boyd would have a bias against plaintiff because of her age, hire her anyway, and then terminate her a short time later for discriminatory reasons.

Thus, for all of these reasons, the Court finds that plaintiff cannot sustain her claim of age discrimination and Eastman is entitled to summary judgment on this claim.

B.    Gender Discrimination Claim

As with her age discrimination claim, plaintiff has no direct evidence of gender discrimination[17] and her Title VII claim is analyzed pursuant to the *McDonnell Douglas* burden shifting framework. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). Accordingly, she has the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence by showing: (1) she is a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment decision; and (4) she was replaced by a person outside the protected class or treated

---

[17]A claim of gender discrimination may be established through either direct or circumstantial evidence of discrimination. *Reeves v. Tenn. Farmers Mut. Ins. Co.*, 555 F. App'x 509, 511 (6th Cir. 2014).

differently than similarly-situated non-protected employees. *Id*. Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Id*. If the defendant does so, the burden then shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination. *Id*. at 391—92. Throughout this process, the plaintiff retains the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her. *Id*. at 392.

As set forth above and as argued by Eastman, it is undisputed that plaintiff was replaced by a female, Kathy Chapman, and she has presented no evidence that she was treated less favorably than a similarly situated male employee. And, as with her age discrimination claim, plaintiff argues that her "unique" gender discrimination claim does not require proof of a prima facie case involving "comparators" or "replacements," but cites no authority to support this proposition [Doc. 21 at p. 11]. Finally, to the extent that Dr. Boyd's alleged comments regarding April White expressed a preference, he expressed a preference for another female employee; thus, there is no evidence that his actions were gender-based. The plaintiff cannot establish a prima facie case of gender discrimination and she has presented no evidence of pretext, i.e., that Eastman intentionally discriminated against her because of her gender. Accordingly, Eastman's motion for summary judgment will be granted as to plaintiff's gender discrimination claim.

C.    Hostile Work Environment

Plaintiff has alleged that Dr. Boyd and Eastman created a hostile work environment because she was an older woman [Doc. 1 at ¶ 13]. In support of this claim, plaintiff relies on her version of the meetings with Dr. Boyd where he pounded the desk with his fist, waived his arms wildly, turned red-faced, and told her she was "not as good as the younger assistant, April White" [Doc. 21 at pp. 2, 14—15]. Eastman argues that plaintiff cannot establish a hostile work environment claim because she has no evidence that she was harassed "on the basis of" her gender and any alleged harassment based on age was not sufficiently severe or pervasive to rise to the level of a hostile work environment [Doc. 14 at pp. 21—23].

In general, to prevail on a hostile work environment claim, a plaintiff must show that (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual or age-based harassment; (3) the harassment complained of was based on sex or age; (4) the charged harassment created a hostile work environment; and (5) the employer is liable. *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 307 (6th Cir. 2016); *Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 733 (6th Cir. 2006); *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834—35 (6th Cir. 1996) (holding that a hostile work environment claim is available under the ADEA). "A hostile work environment occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 463 (6th Cir.

2000) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). The workplace environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998) (citing *Harris,* 510 U.S. at 21–22).

Sexual harassment is based on gender where, "but for the fact of her sex, [the plaintiff] would not have been the object of harassment." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (internal quotation marks omitted); *Hickman v. Laskodi*, 45 F. App'x 451, 454 (6th Cir. 2002). "The critical issue … is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998); *Bowman*, 220 F.3d at 463—64. As Eastman points out, none of Dr. Boyd's allegedly harassing or hostile conduct was based on plaintiff's sex and his allegedly discriminatory remarks were not based on her gender. Plaintiff casually suggests that Dr. Boyd's "physically threatening hostility toward his only female assistant is compelling evidence of a gender-based hostile work environment" [Doc. 21 at p. 1, n.1]. However, plaintiff has presented no evidence that any similarly situated male employees were treated more favorably; her argument regarding his treatment of the male Group Leaders falls short as they were not Administrative Assistants like the plaintiff [Doc. 22 at ¶ 29]. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (to be

similarly situated, the individual with whom the plaintiff seeks to compare herself must be similar in "all of the *relevant* aspects.") (emphasis in original).[18]

With regard to Dr. Boyd's alleged statement that plaintiff was "not as good as the younger assistant, April White," it is fair to describe this comment as based in part on age and in part on his assessment of plaintiff's relative competence. Giving plaintiff's testimony the benefit of the doubt, Dr. Boyd allegedly made this statement four times beginning with her 39-week D&ER meeting in June 2013. In determining whether this rises to the level of a hostile or abusive work environment, the Court considers the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher*, 524 U.S. at 787–88. "[T]he issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether-taken together-the reported incidents make out such a case." *Bowman*, 220 F.3d at 463 (quoting *Williams*, 187 F.3d at 562). Isolated incidents, without more, must be extremely serious to serve as a basis for liability. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000).

---

[18]"A similarly situated employee is one who has the same supervisor, was subject to the same standards of conduct, and engaged in "nearly identical" conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's response." *Batuyong v. Gates*, 337 F. App'x 451, 454 (6th Cir. 2009) (quoting *Mallory v. Noble Corr. Inst.*, 45 F. App'x 463, 471—72 (6th Cir. 2002).

27

Plaintiff's response brief summarily claims that she has shown an objectively and subjectively hostile work environment [Doc. 21 at p. 15], and her affidavit claims that, as a result of Dr. Boyd's hostility, she experienced stress and anxiety, she cried every night, and she has been diagnosed with PSTD following her discharge [Doc. 22 at ¶ 32]. Even accepting plaintiff's description of her subjective response to Dr. Boyd's behavior as true, the Court cannot conclude that plaintiff's evidence rises to the level of an objectively hostile work environment. Plaintiff has complained of two instances, three months apart, where Dr. Boyd became upset, yelled, waved his arms, slammed his fist on the desk, and told her she was not as good as a younger assistant. These two incidents, while understandably upsetting to plaintiff, are not severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and there is no evidence that this conduct changed the terms and conditions of her employment. Title VII "does not set forth 'a general civility code for the American workplace.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale*, 523 U.S. at 80)). *See Batuyong v. Gates*, 337 F. App'x 451, 457—58 (6th Cir. 2009) (four incidents where supervisors criticized plaintiff were not pervasive or so objectively severe that they actually changed the terms and conditions of her employment); *Goller v. Ohio Dep't of Rehab. & Corr.,* 285 F. App'x 250 (6th Cir. 2008) (supervisor's derogatory name calling insufficient to establish hostile work environment and not sufficiently severe or threatening to interfere with plaintiff's work performance); *Trepka v. Bd. of Educ.*, 28 F. App'x. 455, 461 (6th Cir. 2002) (supervisor's "contentious oral confrontation" with yelling and "stern words about

28

[plaintiff's] ability to walk" not hostile work environment); *Peake v. Brownlee*, 339 F. Supp. 2d 1008, 1018—19 (M.D. Tenn. 2003) (six incidents over a period of 22 months were "isolated incidents" and not sufficiently pervasive to constitute a hostile work environment).

Finally, in her response brief, plaintiff suggests that her gender only has to be a "motivating" factor in Eastman's hostile work environment [Doc. 21 at p. 15]. The "motivating factor" language comes from the mixed-motive theory of discrimination claims, codified at 42 U.S.C. § 2000e-2(m), where a plaintiff can demonstrate that "an illegitimate discriminatory animus factored into the defendant's decision." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008); *see Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012) (a mixed-motive analysis applies to cases "where an adverse employment decision was the product of a mixture of legitimate and illegitimate motives") (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 571 (6th Cir. 2003)). However, the mixed-motive theory does not apply to hostile work environment claims because, as the Eighth Circuit has noted, "[a]n employer could never have a legitimate reason for creating a hostile work environment." *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1326 (8th Cir. 1994); *Marshall v. Super Service, LLC*, No. 6:14-229-DCR, 2016 WL 1389595, at *16 (E.D. Ky. Apr. 6, 2016); *Alexander v. Univ. of Ky.*, No. 5:10-CV-48-REW, 2012 WL 1068764, at *20 (E.D. Ky. Mar. 28, 2012) (quoting *Stacks*). Accordingly, to the extent that such a theory has been presented, the Court finds that it also falls short.

29

For all of these reasons, the Court finds that Eastman is entitled to summary judgment on plaintiff's hostile work environment claims.

D.     Retaliation

Finally, plaintiff claims that she was terminated in retaliation for complaining about the age and sex discrimination and hostile work environment [Doc. 1 at ¶¶ 23—24].  Both Title VII and the ADEA prohibit employers from retaliating against an employee for opposing or reporting discrimination.  42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d).

To make out a prima facie case of retaliation, the plaintiff must establish that: (1) she engaged in activity protected by Title VII or the ADEA; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (Title VII); *Blizzard*, 698 F.3d at 288 (ADEA).  Both statutes require that retaliation claims be proved according to "traditional principles of but-for causation, … proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533 (Title VII); *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (Title VII and ADEA anti-retaliation provisions are construed similarly).

Eastman argues that plaintiff cannot establish the fourth prong of a prima facie retaliation case, i.e., that her protected activity and her termination were causally connected.  Instead, Eastman argues that the "wheels were in motion" for her termination

prior to her complaint to Ms. Angles [Doc. 14 at pp. 23—26; Doc. 23 at pp. 13—15]].

Plaintiff argues that her hostile work environment "morphed into" a retaliatory discharge

after she complained to Ms. Angles [Doc. 21 at p. 4]. She also argues that even if Dr. Boyd

was unaware of her complaints, Ms. Angles was aware of them and therefore Eastman had

knowledge of her complaints shortly before she was terminated [*Id*. at pp. 4—5, 15].

The record reflects that plaintiff complained to Ms. Angles on September 9, 2013

and she was terminated on September 25, 2013, approximately three weeks later.[19]

Plaintiff claims that Ms. Angles called her at home later on September 9 and told her "that

she had talked with Dr. Boyd" [Doc. 22 at ¶ 48]. Assuming that plaintiff had fully

conveyed the nature of her complaints to Ms. Angles (which Eastman disputes) and that

Ms. Angles repeated the full nature of those complaints to Dr. Boyd (which Eastman also

disputes),[20] the issue is whether Dr. Boyd's knowledge of plaintiff's protected activity on

September 9 is causally connected to her termination on September 25. In short, plaintiff

---

[19]Although plaintiff's affidavit claims that she told Dr. Boyd on June 26, 2013, "that he was creating a hostile work environment" [Doc. 22 at ¶ 33], plaintiff does not rely on this complaint as protected activity. Even if true, this complaint would not constitute protected participation in an employer's internal investigation into allegations of discrimination pursuant to a pending EEOC charge, *Abbott v. Crown Motor Co.,* 348 F.3d 537, 543 (6th Cir. 2003), or opposition to an unlawful employment practice, *Fox,* 510 F.3d at 591. "[A] vague charge of discrimination … is insufficient to constitute opposition to an unlawful employment practice." *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1313 (6th Cir. 1989).

[20]Eastman and Dr. Boyd dispute that he had any knowledge that plaintiff's complaint to Ms. Angles concerned his alleged comments about her age [Doc. 15 at ¶ 26; Doc. 16 at ¶ 9]. Eastman correctly asserts that to prove a causal connection plaintiff must establish that the decisionmaker involved in her termination had knowledge of the protected activity, as one cannot retaliate against an employee for engaging in protected activity unless he knew the employee had done so. *See Scott v. Eastman Chem. Co.,* 275 F. App'x 466, 482 (6th Cir. 2008). However, at the summary judgment stage, the Court must accept plaintiff's version of the facts as true.

31

relies on the close temporal proximity between her complaint to Ms. Angles and her termination as evidence of a causal connection. Eastman points to Dr. Boyd's June D&ER which was critical of plaintiff's performance and warned her of the potential for termination if she did not improve. Eastman also points to e-mails in which Dr. Boyd complained about plaintiff's performance and questioned whether he had to "wait" to terminate her [Doc. 15-3 at pp. 10—11]. Thus, Eastman argues that plaintiff's termination was already in the works prior to her complaint to Ms. Angles and the temporal proximity between her complaint and her termination is insufficient to establish a causal connection.

"Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014) (quoting *Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 525 (6th Cir. 2008)); *Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 501 (6th Cir. 2013). The three-week period between plaintiff's complaint to Ms. Angles and her termination can easily be considered "very close in time." *See, e.g. Amos v. McNairy Cnty.*, 622 F. App'x 529, 538 (6th Cir. 2015) (termination 17 days after EEOC investigation established causal connection). However, the Supreme Court and the Sixth Circuit have cautioned that an employee who can "see the proverbial writing on the wall" should not be able to invoke the protections of Title VII to insulate herself from a previously contemplated adverse employment action. *Montell*, 757 F.3d at 507 (citing *Nassar*, 133 S. Ct. at 2532 and *Clark*

*Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)).  Thus, when the employer proceeds with a previously contemplated adverse employment action, the temporal proximity of the adverse employment action is not evidence of causality.  *Id.*  The key consideration in retaliation cases is "what made [the employer] fire [the employee] *when it did.*"  *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009) (emphasis added).  Thus, the Court "must analyze the evidence of how and when the adverse employment action occurred to determine whether it squares with the action previously contemplated. If it does, then temporal proximity is not evidence of causality, but if the adverse employment action is unlike the action previously contemplated or does not occur on the schedule previously laid out, then the temporal proximity of the adverse action to the protected conduct is certainly evidence of causation."  *Montell*, 757 F.3d at 507.

The record reflects that by June 2013 Dr. Boyd was dissatisfied with plaintiff's performance.  He solicited input on her performance from his Group Leaders to include in her 39-week D&ER on which he rated her as not meeting expectations.  Plaintiff admits that Dr. Boyd was not satisfied with her performance in June 2013 and that she could be terminated if her performance did not improve.  The record also contains emails after the June 2013 D&ER in which Dr. Boyd or others note continued problems with plaintiff's performance [Doc. 15-3 at pp. 10—17].  In one series of emails with Ms. Angles, Dr. Boyd notes "[a] pattern of making excuses to avoid accepting responsibilities for her poor judgment are continuing after a discussion of not meeting expectations" and questions whether he "really need[s] to wait 6 weeks" [Doc. 15-3 at pp. 10—11].  Thus, the

33

implication from Dr. Boyd's email is that he preferred to take some type of disciplinary action before the next review period expired. Further, plaintiff admits that on September 9, 2013, prior to her complaint to Ms. Angles, Dr. Boyd expressed frustration with her performance and her request to take vacation during the course of an important company-wide meeting. She also admits that Dr. Boyd advised that he would conduct her 52-week D&ER when she returned from vacation. Plaintiff returned from vacation on September 23 and was terminated on September 25 [Doc. 22 at ¶¶ 55—56]. Her final D&ER reflects the performance issues Dr. Boyd observed over time.

In sum, while plaintiff's termination closely followed her complaint to Ms. Angles, the Court concludes that Dr. Boyd was contemplating her termination as early as June. Thus, the disciplinary process was in motion well before plaintiff complained to Ms. Angles. *See DeNoma v. Hamilton Cnty. Ct. of Common Pleas*, 626 F. App'x 101, 111 (6th Cir. 2015). The Court finds that the temporal proximity between her complaint and her termination is not evidence of causation.

Moreover, even if plaintiff could establish evidence of causation, she has not presented sufficient evidence of pretext to overcome Eastman's legitimate non-discriminatory reason for terminating her. As discussed above, plaintiff's evidence of pretext is simply her subjective disagreement with Eastman's assessment of her performance. *See Green*, 374 F. App'x at 577; *Mynatt*, 271 F. App'x at 477; *Mitchell*, 964 F.2d at 585. Therefore, for all of these reasons, the Court finds that Eastman is entitled to summary judgment on plaintiff's retaliation claim.

## V.    Conclusion

For all of the foregoing reasons, the Court finds that Eastman's motion for summary judgment [Doc. 13] is well-taken and it will be **GRANTED**.  An appropriate order will be entered.


    s/ Thomas W. Phillips
    _____
    SENIOR UNITED STATES DISTRICT JUDGE

35